UNITED STATES BANKRUPTCY COURT
FOR THE
WESTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| IN RE: ) | |
| ) | |
| ) | |
| JOE S. ALEXANDER ) | |
| ) | CASE NO. 06-10238(1)(7) |
| Debtor(s) ) | |
| ) | |
| MARK H. FLENER, TRUSTEE ) | AP NO. 08-1013 |
| ) | |
| Plaintiff(s) ) | |
| ) | |
| v. ) | |
| ) | |
| BETTY E. ALEXANDER ) | |
| ) | |
| and ) | |
| ) | |
| MONTICELLO BANKING COMPANY ) | |
| ) | |
| Defendant(s) ) | |

## MEMORANDUM-OPINION

This matter is before the Court on the Complaint to Avoid and Recover Fraudulent and/or Preferential Transfers filed by Plaintiff Mark H. Flener, Trustee ("Trustee") Against Monticello Banking Company ("the Bank"). The parties agreed to stipulate the material facts and submit the matter upon legal memoranda filed by each party in support of its position. For the following reasons, the Court will enter Judgment in favor of the Trustee and against the Bank on the Complaint.

**STIPULATED FACTS**

The Court adopts herein verbatim the Stipulations as filed by the parties on January 25, 2010 pursuant to the Agreed Order entered by the Court on December 21, 2009.  (See dkt. #97).

**LEGAL ANALYSIS**

The Bank and the Trustee agree that the issue to be decided in this case is whether the Bank held a properly and continuously perfected security interest in the CDARS certificates of deposit issued by its Certificate of Deposit Account Registry Service ("CDARS") and the funds disbursed from them at maturity.  The Court determines that the Bank did not have a continuously perfected security interest in the CDs and the funds disbursed.  Accordingly, Judgment in favor of the Trustee on his Complaint is appropriate.

The Trustee initiated this adversary proceeding in order to recover the sum of $190,629.81 that was transferred from the bank account of Debtor Joe Alexander ("Debtor") and his wife, Betty Alexander, maintained by the Bank.  The funds were transferred by the Bank in partial satisfaction of the debt on a loan Debtor had with the Bank.  On April 17, 2006, two weeks after $204,801.20 was deposited into the Debtor's account and after the Bank setoff $190,629.81 on the debt, Debtor filed his Chapter 13 Petition.  The case was subsequently converted to one under Chapter 7 and the Chapter 7 Trustee appointed.

Of the Stipulated Facts, the Court finds one of the key facts in this case is that the transaction at issue was a reciprocal transaction.  Don Daily, a representative of the Promontory Interfinancial Network, LLC ("Promontory") described the nature of a reciprocal transaction.  In such a transaction, the Bank ("Relationship Bank") places an order on behalf of its customer ("Customer") in the aggregate amount that the Customer seeks to invest.  Promontory then divides the Customer's

order into smaller amounts each of which qualifies for Federal Deposit Insurance Corporation ("FDIC") coverage. Promontory allocates the smaller insured amounts to other participating banking institutions ("Issuing Bank") who desire to issue certificates of deposit at that time. The Issuing Bank then issues the certificates of deposit. In return, Promontory then allocates to the Relationship Bank orders from other Relationship Institutions in the same aggregate amount as the original order. The Relationship Bank then becomes the Issuing Bank for certificates of deposit on these orders. Thus, in a reciprocal transaction the Relationship Bank not only sends out Customer funds for investment, but actually ends up lending money in its name in the form of certificates of deposit to Customers of other Relationship Banks.

This enterprise is organized by Promontory and it handles the allocation process. Promontory utilizes the services of Bank of New York Mellon ("BNY") to maintain the transaction records and manage the settlement process for funding CDARS transactions. Transactions in this network are initiated when a Relationship Bank places an order for a CDARS CD with Promontory. Promontory utilizes a sophisticated program to find interested Receiving Banks to issue CDs to satisfy the order placed. The allocation of CDARS between participating banks happens simultaneously. Significantly, in these transactions however, the Customer is not the owner of the CD but rather BNY is listed as the owner and holds the CD on behalf of the Customer. In fact, Issuing Banks are aware that a CDARS CD has been issued to BNY under this network but are not aware of the Customer on whose behalf the CD was issued.

In September of 2005, the Bank placed an order on behalf of Debtor for CDs through Promontory in the amount of $200,907.28. The paper trail on the transaction shows that on September 29, 2005, the Bank was processing the funds for the purchases which were withdrawn

from Debtor's savings account (Acct. # ----0018) at the Bank.  On September 27, 2005 the Bank credited its CDARS work in process "in-clearing account" (Acct. # ----2320) with the $200,907.28 from Debtors' savings account.  On September 29, 2005 the Bank debited the CDARS in-clearing account (Acct. # ----2320) for $200,907.28 for the purchase of the CDARS CDs.  On September 29, 2005 the Bank credited to the "Non-Public Funds-CDARS" (Acct. # ----2330) $96,000.00 and credited to its "Public Funds-CDARS" (Acct. # ----2340) the sum of $104,907.28.

The CDARS in-clearing account and the CDARS Non-Public Funds and Public Funds accounts contained co-mingled funds from other customers of the Bank for purchase of CDARS CDs.  The Debtors did not have any control over any of the funds in the Bank's CDARS clearing accounts.

The Bank electronically transferred the funds to BNY who in turn distributed the funds to Issuing Banks in the Promontory Network in such amounts that would qualify for FDIC insurance.

Debtor and the Bank entered into a Deposit Placement Agreement to purchase $200,907.28 in CDs through the CDARS program.  Promontory allocated the Debtor's funds to the following three banks in the following amounts:

The Coastal Bank – Cert. #8296, $96,000;

Citizens Trust Bank – Cert. #6982, $96,000;

Greater Buffalo Savings Bank – Cert. #8261, $8,907.28.

These three Issuing Banks then issued CDARS CDs in the name of BNY.

In December 2005, before the CDARS CDs matured, Debtor borrowed $225,075 from the Bank, evidenced by a Promissory Note.  To secure repayment, Debtor and his wife executed a

Security Agreement and an Assignment of the savings account, granting the Bank an assignment on the Debtor's account, which included the CDARS CD account.

On March 30, 2006, the three Issuing Banks paid the amounts due to BNY and transferred $204,801.20 to the Bank, which was deposited in full between the CDARS Public Funds Account and the CDARS Non-Public Funds Account. The Bank transferred those sums to its CDARS "in-clearing" account and credited that same amount to Debtor's checking account (Acct. # ----2906). On April 6, 2006, the Bank removed $190,629.81 from Debtor's account and applied it to the loan that Debtor had previously made with the Bank.

It is clear to the Court that the Bank's security interest was not continuously perfected. The funds used to purchase the CDARS CDs were transferred from the Debtor's account with the Bank first to BNY and then to the three institutions that issued the CDs. The Debtor lost control of the funds when they were co-mingled in the in-house clearing account. The Bank lost control when those funds were transferred to BNY to complete the CDARS transactions. The Court is unpersuaded by the Bank's argument that Debtors' funds "never left the Bank" and thus the Bank maintained control over them throughout. This clearly was not the case.

The transaction is classified as a reciprocal transaction. The funds were transferred from the Bank to BNY which pooled these deposits with other participating institution deposits which were then reallocated and documented into CDARS CDs. The respective CDs represented financial obligations of the Issuing Banks. BNY, as custodian for the Customers, had contractual obligations to the Issuing Banks, the Relationship Banks and the Customers. The fact that cash was not loaded onto trucks and physically sent to another location is a product of the electronic age. Readily available funds on deposit are transferred in the manner detailed in this memorandum and as set

forth in the documents tendered in this case routinely across the industrialized financial world. The records from the Bank, BNY and the Issuing Banks detail these transactions. In the face of the overwhelming documentation in this case, the Bank cannot claim that the funds for the CDARS CDs never left the Bank. Once the funds left the Bank, the Bank's security interest no longer applied. See, KRS 355.9-332(2). Once the funds were in the possession of the other institutions, the Bank's security interest no longer attached because the funds were no longer under its control. See, KRS 355.9-312(2)(a) and KRS 355.9-104(1).

The Bank's security interest is set forth in the Note, the Security Agreement and the Assignment. The Note granted a security interest in "Assignment of Certificate of Deposit #2581 at CDARS CD." The Security Agreement granted a security interest in Debtor's "demand, time, savings, passbook or similar accounts at the Bank, including "assignment of certificate of deposit #2581 at CDARS CD." The Assignment assigned the Bank the Debtor's "account" evidenced by certificate #2581.

Under Kentucky law, the Bank had a security interest in Debtor's deposit accounts. See, KRS 355.9-102(1)(ac). The assignment and the CDARS CD referenced a time deposit account. However, the CDARS CDs were deposit accounts maintained at the three banks that issued them. The Bank had no control over these and a security interest in a deposit account may only be perfected by control. KRS 355.9-312(a)(a).

Under the facts presented, BNY was the custodian of the CDARS CDs issued by the three Issuing Banks. The Debtor had only a securities entitlement to the CDs. A securities entitlement refers to the "rights and property interest of an entitlement holder" with respect to a financial asset.

KRS 355.8-102(1)(q). The Debtor was an "entitlement holder" as defined by KRS 355.8-102(1)(g) and the Bank was a "securities intermediary" as described in KRS 355.8-102(1)(n)(2).

The Bank did not have a security interest in the Debtor's securities entitlement because it was not adequately described as required by KRS 355.9-108. The Bank's documents do not describe the interest as either a "securities entitlement", "securities account" or "investment property". Further, the documents do not adequately describe any of the underlying CDs issued by any of the three Issuing Banks.

The Court fully agrees with the Trustee's analysis as to why the Bank did not have a continuously perfected security interest in the CDARS CDs. The Bank accepted all benefits of the Promontory enterprise and its allocation of its customer's funds for the CDARS CDs. It cannot now deny the legal effects of the transactions and the loss of its security interest in the funds at issue. Accordingly, Judgment in favor of the Trustee on his Complaint is warranted.

## CONCLUSION

For all of the above reasons, the Court grants Judgment in favor of Plaintiff Mark H. Flener, Trustee on his Complaint to Avoid and Recover Fraudulent and/or Preferential Transfers Against Defendant Monticello Banking Company.

Joan A. Lloyd
United States Bankruptcy Judge
Dated: June 4, 2010

UNITED STATES BANKRUPTCY COURT
FOR THE
WESTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| JOE S. ALEXANDER | ) | |
| | ) | CASE NO. 06-10238(1)(7) |
| Debtor(s) | ) | |
| | ) | |
| MARK H. FLENER, TRUSTEE | ) | AP NO. 08-1013 |
| | ) | |
| Plaintiff(s) | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BETTY E. ALEXANDER | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MONTICELLO BANKING COMPANY | ) | |
| | ) | |
| Defendant(s) | ) | |

## JUDGMENT

Pursuant to the Memorandum-Opinion entered this date and incorporated herein by reference,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that Judgment is entered in favor of Plaintiff Mark H. Flener, Trustee on his Complaint to Avoid and Recover Fraudulent and/or Preferential Transfers Against Defendant Monticello Banking Company.

This is a final and appealable Judgment. There is no just reason for delay.

_____
Joan A. Lloyd
United States Bankruptcy Judge
Dated: June 4, 2010